# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
### BEAUFORT DIVISION

| | | |
|---|---|---|
| Anthony Dickerson, | ) | Civil Action No.:_____ 9:26-cv-01028-DCN |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| Merrick Bank, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

1.     This is an action brought by Plaintiff, Anthony Dickerson, for actual, statutory and punitive damages, attorneys' fees, and costs for Defendant's violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. (hereinafter "FCRA").  Plaintiff also seeks compensatory and punitive damages for the Defendant's violations of South Carolina common law set forth herein.

2.     The FCRA exists to protect consumers' privacy and to impose upon those who trade in consumers' private information strict requirements to ensure that the information they report is as accurate as possible.

3.     Before the enactment of the FCRA, inaccurate and misleading information was identified as "the most serious problem in the credit reporting industry." 115 Cong. Rec. 2411 (Jan. 31, 1969). With this problem in mind, Congress enacted the FCRA "to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report." S. Rep. No. 91-517 (1969).

1

4.     To accomplish Congress' goals, the FCRA contains a variety of requirements to protect consumers, including §§ 1681e and 1681s-2(b), which are two of the cornerstone provisions of the FCRA.

5.     One of the primary purposes of the FCRA is to assure "maximum possible accuracy" of consumer information to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

6.     The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as *deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. * * * [A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed* (emphasis added).

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)].

## JURISDICTION AND VENUE

7.     This Court has Jurisdiction under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §1681p and 28 U.S.C. §§1331 and 1367.

8.     Venue is proper in the Beaufort Division because the Plaintiff resides in Beaufort County, and the Defendant transacted business in this division.

## PARTIES

9.     Plaintiff, Anthony Dickerson, is a resident and citizen of the State of South Carolina, Beaufort County, and is over the age of twenty-one (21) years.  Plaintiff is a consumer as that term is defined by the FCRA, 15 U.S.C. §1681a(c).

10.     Defendant Merrick Bank is a Utah corporation that may be served with process through its registered agent for service of process, C T Corporation System, 2 Office Park Court, Suite 103, Columbia, South Carolina 29223.  Defendant Merrick was in all respects and at all times relevant herein doing business in the state of South Carolina.

11.     Merrick Bank is a furnisher of information to multiple Consumer Reporting Agencies ("CRAs"), including Equifax, Experian, and TransUnion, in that it regularly reports account data on consumer credit cards.

## FACTUAL ALLEGATIONS

12.     Plaintiff is the owner and operator of a funeral home which provides custom funeral services in the counties of Beaufort and Jasper.

13.     In early 2024, Plaintiff discovered he had been the victim of identity theft.

14.     On or about April 15, 2024, Plaintiff obtained copies of his TransUnion, Equifax, and Experian credit reports and discovered several fraudulent accounts were reporting as belonging to him.  Specifically, Merrick Bank, Account No. 41206180**** (hereinafter the "Account"), which Plaintiff never opened or authorized, was reporting as a derogatory account on all three of Plaintiff's credit reports.  Plaintiff later learned the fraudulent

Account was opened in his name, without his knowledge, by his now ex-wife.

15.     On or about May 17, 2024, Plaintiff filed an FTC Identity Theft Affidavit.

16.     On or about May 17, 2024, Plaintiff also filed separate complaints against each of the consumer reporting agencies ("CRAs") with the Consumer Financial Protection Bureau (hereinafter "CFPB"), wherein he stated he had reviewed his credit reports and found several fraudulent accounts opened in his name.  Plaintiff informed the CFPB that he was upset and distressed by the discovery he had been the victim of identity theft because he was currently applying for credit and needed his credit reports to be correct.  With each complaint, Plaintiff attached a copy of his FTC Affidavit.

17.     In July 2024, in an effort to get the fraudulent accounts, including the Account, removed from his credit reports as quickly as possible, Plaintiff hired Credit Beast, a credit repair service.

18.     On or about July 12, 2024, through Credit Beast, two dispute letters were sent to Merrick Bank disputing the Account.

19.     On or about July 12, 2024, with the help of Credit Beast, three dispute letters were sent to TransUnion disputing the Account.  Upon receipt of Plaintiff's disputes, TransUnion forwarded same to Defendant for investigation.

20.     On or about July 12, 2024, through Credit Beast, three dispute letters were sent to Equifax disputing the Account.  Upon receipt of Plaintiff's disputes, Equifax forwarded same to Defendant for investigation.

21.     On or about July 12, 2024, through Credit Beast, two dispute letters were sent to Experian.  One letter provided the name and address that should be reporting on his credit

report, and the second letter disputed the Account. Upon receipt of Plaintiff's Account dispute, Experian forwarded same to Defendant for investigation.

22.    On or about July 15, 2024, Experian provided its response to Plaintiff's dispute to the CFPB, wherein Experian stated it had contacted Defendant, the furnisher of the disputed Account, and asked them to verify the accuracy of the information.  Because Defendant verified the Account as accurate, the Account continued to be reported on the Plaintiff's Experian credit report.

23.    On or about August 28, 2024, Plaintiff filed a police report with the Beaufort County Sheriff's Department.

24.    On or about August 30, 2024, Plaintiff filed a second complaint against Experian with the CFPB, wherein he disputed the reporting of the Account.

25.    In September 2024, Plaintiff was in the process of trying to obtain a business loan. In order for the loan to be considered, Plaintiff was informed that the fraudulent Account would need to be paid off.  As Plaintiff had no choice, he contacted Defendant to pay off the fraudulent Account.  Defendant referred Plaintiff to North American Recovery, a debt collection agency, that had been assigned the Account for collection.

26.    Thereafter, on September 11, 2024, Plaintiff paid off the Account in full by making a debit card payment in the amount of $1,464.18, to North American Recovery.

27.    On or about September 20, 2024, Plaintiff sent a dispute letter to Experian disputing the reporting of the Account by Merrick Bank. Thereafter, Experian forwarded Plaintiff's complaint to Defendant.

28.    On or about September 20, 2024, Plaintiff sent a dispute letter to Equifax disputing

the reporting of the Account by Merrick Bank.

29.     On or about September 24, 2024, Plaintiff sent a dispute letter to TransUnion disputing the Account and requesting the Account be deleted from his TransUnion credit report.  Upon receipt, TransUnion forwarded same to Defendant.

30.     On September 29, 2024, Equifax sent Defendant an Automated Consumer Dispute Verification (hereinafter "ACDV") informing Defendant that "Consumer States Inaccurate Information," "Provide or Confirm Complete ID and Verify All Account Information." On October 9, 2024, Defendant, by and through its employee MGarciaAPI, responded to Equifax's ACDV that "Cons Dispute not specific. Cons Info Verified. Acct Info Updted."

31.     On or about October 2, 2024, Plaintiff sent dispute letters directly to Defendant through Credit Beast.

32.     On or about October 2, 2024, Plaintiff sent a dispute letter to TransUnion through Credit Beast, wherein Plaintiff disputed the Account as fraudulent.  Upon receipt of Plaintiff's disputes, TransUnion forwarded same to Defendant.

33.     On or about October 2, 2024, Plaintiff sent a dispute letter to Equifax through Credit Beast, wherein Plaintiff disputed the Account as fraudulent. Upon receipt of Plaintiff's dispute, Equifax forwarded same to Defendant.

34.     On or about October 2, 2024, Plaintiff sent dispute letters to Experian through Credit Beast, wherein Plaintiff disputed the Account as fraudulent.  Upon receipt of Plaintiff's disputes, Experian forwarded same to Defendant.

35.     On or about October 5, 2024, TransUnion responded to Plaintiff's dispute through the CFPB.  In that response, TransUnion informed Plaintiff that it had investigated

Plaintiff's disputes of the Account and Defendant had updated and verified the Account as reported. Accordingly, the fraudulent Account continued to be reported on Plaintiff's TransUnion credit report.

36.     On or about October 7, 2024, Plaintiff filed a complaint against Defendant with the CFPB, wherein he stated he was unaware of the debt, did not have the opportunity to dispute the information provided, and requested that Defendant provide Plaintiff with proof of delivery that proper notification was sent to Plaintiff regarding the Account.

37.     On October 7, 2024, the CFPB referred Plaintiff's Complaint against Defendant to the Federal Deposit Insurance Corporation, whom the CFPB stated was the agency better able to help with Plaintiff's issue.

38.     On or about October 10, 2024, Plaintiff sent another dispute letter to TransUnion disputing the Account as inaccurate and requesting the Account be deleted from his TransUnion credit report.

39.     On or about October 13, 2024, Equifax responded to Plaintiff's dispute through the CFPB. In that response, Equifax informed Plaintiff that it was either currently processing Plaintiff's dispute of the Account or it had recently provided Plaintiff with the results.

40.     On or about October 29, 2024, Experian provided its response to Plaintiff's dispute to the CFPB. In its response, Experian stated it had contacted the Defendant and asked Defendant to verify the accuracy of the Account. Thereafter, Defendant verified the Account as accurate. As a result, the Account continued to be reported on the Plaintiff's Experian credit report.

41.     On or about November 22, 2024, Experian sent Defendant an ACDV informing

7

Defendant that Plaintiff disputed the Account as "True Identity Fraud," "Account Fraudulently Opened." On December 9, 2024, Defendant, by and through its employee KJohnsonAPI, responded to Experian's ACDV by verifying the reporting of the Account as accurate.

42.     On or about November 30, 2024, Experian sent Defendant another ACDV informing Defendant that Plaintiff disputed the Account as "True Identity Fraud," "Account Fraudulently Opened." On December 9, 2024, Defendant, by and through its employee KJohnsonAPI, responded to Experian's ACDV by verifying the reporting of the Account as accurate.

43.     On or about December 20, 2024. TransUnion notified Plaintiff that it refused to block the Account.

44.     On or about December 30, 2024, Plaintiff obtained a copy of his TransUnion and Equifax credit reports. Upon reviewing each credit report, Plaintiff discovered that the Account was still reporting as belonging to him.

45.     Frustrated that his credit reports still contained inaccurate and fraudulent information, in or around January 2025, Plaintiff terminated Credit Beast's services.

46.     On or about January 2, 2025, Experian sent Defendant an ACDV informing Defendant that Plaintiff disputed the Account as "True Identity Fraud," "Account Fraudulently Opened." On January 3, 2025, Defendant, by and through its employee mgibsonAPI, responded to Experian's ACDV by verifying the reporting of the Account as accurate.

47.     On January 3, 2025, Equifax sent Defendant an ACDV informing Defendant that

Plaintiff disputed the Account as "True Identity Fraud," and "Account Fraudulently Opened." On January 10, 2025, Defendant, by and through its employee ccejaAPI, responded to Equifax's ACDV by verifying the reporting of the Account as accurate, and updating unrelated Account information not related to Plaintiff's dispute.

48.     On or about January 10, 2025, TransUnion forwarded Plaintiff Investigation Results, wherein TransUnion informed Plaintiff the Account was verified as accurate by Defendant. As a result, the disputed Account remained on Plaintiff's credit report. With the Investigation Results, TransUnion also included an updated TransUnion credit report dated January 10, 2025, which confirmed that Defendant was continuing to report the fraudulent Account as belonging to Plaintiff.

49.     On January 12, 2025, Equifax sent Defendant an ACDV informing Defendant that Plaintiff disputed the Account as "True Identity Fraud," and "Account Fraudulently Opened." On January 16, 2025, Defendant, by and through its employee TBowenAPI, responded to Equifax's ACDV by verifying the reporting of the Account as accurate, and updating Account information unrelated to Plaintiff's dispute.

50.     On or about January 29, 2025, Plaintiff obtained a new copy of his Experian credit report which continued to report the Account as belonging to Plaintiff.

51.     On or about February 8, 2025, Experian sent Defendant an ACDV informing Defendant that Plaintiff disputed the Account as "True Identity Fraud," and "Account Fraudulently Opened." On February 12, 2025, Defendant, by and through its employee BGreenAPI, responded to Experian's ACDV by verifying the reporting of the Account as accurate.

52.     On February 9, 2025, Equifax sent Defendant an ACDV informing Defendant that Plaintiff disputed the Account as "True Identity Fraud," and "Account Fraudulently Opened."  On February 12, 2025, Defendant, by and through its employee BGreenAPI, responded to Equifax's ACDV by verifying the reporting of the Account as accurate, and updating unrelated Account information.

53.     On or about February 24, 2025, Plaintiff sent a new dispute letter to TransUnion.  In this letter, Plaintiff again informed TransUnion that he had been the victim of identity theft, and that the Account was a fraudulent account opened in his name by his ex-wife without his knowledge.  Plaintiff also informed TransUnion that in trying to obtain a business loan he was told the Account had to be paid off in full.  Plaintiff contacted Defendant who referred Plaintiff to North American Recovery.  Plaintiff paid off the Account in full through North American Recovery on September 11, 2024.  In his letter to TransUnion, Plaintiff provided proof of payment to North American Recovery, his Social Security number, date of birth, and address.  TransUnion received Plaintiff's dispute on March 13, 2025, and thereafter forwarded same to Defendant.

54.     On or about February 24, 2025, Plaintiff sent a new dispute letter to Equifax.  In his letter, Plaintiff stated he had been the victim of identity theft and fraud.  Plaintiff specifically disputed the Account as being fraudulently opened by his ex-wife without his knowledge.  Plaintiff informed Experian he paid off the Account in full through North American Recovery on September 11, 2024.  With his letter, Plaintiff provided proof of payment to North American Recovery, his full Social Security number, date of birth, and address, and requested Equifax fix his credit report so it would be correct.  Equifax received

Plaintiff's dispute on March 15, 2025, and thereafter forwarded same to Defendant.

55.    On or about February 24, 2025, Plaintiff sent a dispute letter to Experian again stating he had been the victim of identity theft and fraud.  Plaintiff specifically identified and disputed the Account as a fraudulent account opened in his name by his ex-wife without his knowledge.  Plaintiff informed Experian that in the process of trying to obtain a business loan, he was told the Account had to be paid off.  Therefore, Plaintiff contacted Defendant who referred him to North American Recovery.  Plaintiff paid off the Account in full on September 11, 2024, through North American Recovery. With his letter, Plaintiff provided proof of payment to North American Recovery, his Social Security number, date of birth, and address to Experian. Experian received Plaintiff's dispute on March 4, 2025, and thereafter forwarded same to Defendant.

56.    On or about March 6, 2025, TransUnion forwarded its Investigation Results to Plaintiff and included an updated copy of Plaintiff's credit report.  The fraudulent Account continued to be reported on Plaintiff's credit report.

57.    On or about March 11, 2025, Experian sent Defendant an ACDV informing Defendant that Plaintiff disputed the Account as "True Identity Fraud," and "Account Fraudulently Opened."  On March 17, 2025, Defendant, by and through its employee BGreenAPI, responded to Experian's ACDV by verifying the reporting of the Account as accurate.

58.    On March 12, 2025, Equifax sent Defendant an ACDV informing Defendant that Plaintiff disputed the Account as "True Identity Fraud," and "Account Fraudulently Opened."  On March 17, 2025, Defendant, by and through its employee BGreenAPI,

responded to Equifax's ACDV by verifying the reporting of the Account as accurate.

59.     On or about March 17, 2025, Plaintiff received a letter from Equifax requesting proof of his identity.

60.     On or about March 26, 2025, Plaintiff sent another dispute letter to TransUnion.  In this letter, Plaintiff stated he had received TransUnion's Investigation Results, but there were still fraudulent and incorrect accounts appearing on his credit report.  Plaintiff again stated he had been the victim of identity theft and specifically disputed the Account.  With his dispute, Plaintiff again provided proof of payment to North American Recovery.  Plaintiff also attached a copy of the police report he filed, his driver's license, and his Social Security card.  TransUnion received Plaintiff's dispute on April 3, 2025, and thereafter forwarded same to Defendant.

61.     On or about March 26, 2025, Plaintiff sent another dispute letter to Equifax.  In this letter, Plaintiff again informed Equifax he had been the victim of identity theft, and that multiple fraudulent and incorrect accounts were appearing on his credit report.  Plaintiff specifically disputed the Account as a fraudulent account opened in his name without his permission.  With this dispute letter, Plaintiff again included proof of payment to North American Recovery.  Plaintiff also attached a copy of his police report, Equifax's March 17, 2025, letter, his driver's license, and his Social Security card.  Equifax received Plaintiff's dispute on April 4, 2025, and thereafter forwarded same Defendant.

62.     On or about March 28, 2025, TransUnion mailed Investigation Results to Plaintiff. In these results, TransUnion informed Plaintiff that Defendant had verified the Account as accurate.  As a result, the Account continued to be reported as a derogatory account

belonging to Plaintiff on Plaintiff's credit report.

63.     On or about March 28, 2025, Experian forwarded Plaintiff its Investigation Results stating Defendant had verified and updated the Account.  Experian also included an updated copy of Plaintiff's credit report, which continued to report the fraudulent Account as belonging to Plaintiff.

64.     On March 30, 2025, Equifax sent Defendant an ACDV informing Defendant that Plaintiff disputed the Account as "True Identity Fraud," and "Account Fraudulently Opened."  On April 18, 2025, Defendant, by and through its employee BGreenAPI, responded to Equifax's ACDV by verifying the reporting of the Account as accurate.

65.     On April 3, 2025, TransUnion sent Plaintiff a letter stating it refused to block the reporting of the Account.

66.     On or about April 3, 2025, TransUnion forwarded its Investigation Results to Plaintiff and included an updated copy of Plaintiff's credit report, which confirmed the fraudulent Account remained on Plaintiff's credit report.

67.     On or about April 11, 2025, Experian forwarded Plaintiff its Investigation Results stating that Defendant had verified and updated the Account.  Experian also forwarded Plaintiff a copy of his updated credit report dated April 11, 2025.   Upon review, the fraudulent Account continued to be reported as a derogatory account belonging to Plaintiff.

68.     On or about April 24, 2025, TransUnion mailed Investigation Results to Plaintiff. In these results, TransUnion informed Plaintiff that Defendant had verified the Account as accurate.  As a result, the Account continued to be reported as a derogatory account belonging to Plaintiff on Plaintiff's credit report.

69.     On April 26, 2025, Equifax sent Defendant an ACDV informing Defendant that Plaintiff disputed the Account as "True Identity Fraud," and "Account Fraudulently Opened."   On May 15, 2025, Defendant, by and through its employee BGreenAPI, responded to Equifax's ACDV by verifying the reporting of the Account as accurate.

70.     On or about May 7, 2025, Plaintiff sent a new dispute letter to TransUnion.  In this letter, Plaintiff again disputed the Account as a fraudulent account opened in his name without his knowledge or permission.  With his dispute letter, Plaintiff again included proof of payment to North American Recovery, the police report he filed, and a copy of his driver's license. TransUnion received Plaintiff's dispute on May 14, 2025, and thereafter forwarded same to Defendant.

71.     On or about May 7, 2025, Plaintiff sent a new dispute letter to Equifax, disputing the Account as having been opened in his name without his knowledge or permission. Plaintiff again included proof of payment to North American Recovery, the police report he filed, and his driver's license.  Equifax received Plaintiff's dispute on May 20, 2025, and thereafter forwarded same to Defendant.

72.     On or about May 7, 2025, Plaintiff sent a new dispute letter to Experian wherein he disputed the fraudulent Account.  Plaintiff specifically stated he had been the victim of identity theft and that the Account had been opened in his name without his knowledge or permission. With his dispute, Plaintiff provided proof of payment to North American Recovery, the police report he filed regarding the identity theft and a copy of his driver's license.  Experian received Plaintiff's dispute on May 15, 2025, and thereafter forwarded same to Defendant.

73.    On or about May 23, 2025, Experian sent Defendant an ACDV informing Defendant that Plaintiff disputed the Account as "True Identity Fraud," and "Account Fraudulently Opened."   On June 6, 2025, Defendant, by and through its employee BGreenAPI, responded to Experian's ACDV by verifying the reporting of the Account as accurate.

74.    On or about May 23, 2025, Equifax sent Plaintiff a letter stating it refused to block the reporting of the Account.

75.    On or about June 7, 2025, TransUnion forward Plaintiff Investigation Results showing that Defendant had again verified the Account as accurate.

76.    On June 9, 2025, Equifax sent Defendant an ACDV informing Defendant that Plaintiff disputed the Account as "True Identity Fraud," and "Account Fraudulently Opened."   On June 30, 2025, Defendant, by and through its employee BGreenAPI, responded to Equifax's ACDV by verifying the reporting of the Account as accurate.

77.     On or about June 10, 2025, Experian forwarded Plaintiff its Investigation Results showing Defendant had verified and updated the Account.  As a result, the disputed Account remained on Plaintiff's credit report.  With the Investigation Results, Experian also included an updated Experian credit report dated June 10, 2025, which confirmed that Defendant was continuing to report the fraudulent Account as belonging to Plaintiff.

78.    On or about June 11, 2025, Plaintiff sent another dispute letter to Experian disputing the Account as a fraudulent account opened without his knowledge or permission.  Plaintiff included another copy of the proof of payment to North American Recovery, and his police report.  Experian received Plaintiff's dispute and thereafter forwarded same to Defendant.

79.    On or about July 9, 2025, Plaintiff filed another FTC Identity Theft Report wherein

he specifically listed the Account as a fraudulent account.

80.    On or about July 9, 2025, Experian responded to Plaintiff's dispute by forwarding Investigation Results, showing Defendant again verified the disputed Account.  As a result, the Account remained on Plaintiff's credit report.

81.    On or about August 4, 2025, Plaintiff sent a new dispute letter to TransUnion. In this letter, Plaintiff again disputed the Account as a fraudulent account opened in his name without his knowledge.  With his dispute letter, Plaintiff included another copy of the proof of payment to North American Recovery and his police report.  Plaintiff also included a copy of his FTC Identity Theft Report dated July 9, 2025. TransUnion received Plaintiff's dispute on August 15, 2025, and thereafter forwarded same to Defendant.

82.    On or about August 4, 2025, Plaintiff sent a dispute letter to Experian.  In this letter, Plaintiff again disputed the Account as a fraudulent account opened without his knowledge or permission.   With this letter, Plaintiff again included proof of payment to North American Recovery and his police report.   Plaintiff also included a copy of the FTC Identify Theft Report he filed on July 9, 2025. Experian received Plaintiff's dispute letter on August 14, 2025, and thereafter forwarded to Defendant.

83.    On or about August 19, 2025, TransUnion sent Plaintiff a letter stating it had received his fraud block request, but declined to block.

84.    On or about August 21, 2025, Experian sent Defendant an ACDV informing Defendant that Plaintiff disputed the Account as "True Identity Fraud," and "Account Fraudulently Opened."  On September 3, 2025, Defendant, by and through its employee BGreenAPI, responded to Experian's ACDV by verifying the reporting of the Account as

accurate.

85.     On or about August 21, 2025, Experian forward Plaintiff Investigation Results, wherein Experian informed Plaintiff that the Account remained unchanged from Experian's processing of Plaintiff's dispute in June of 2025.   Thus, the Account remained on his credit report.

86.     On or about September 8, 2025, Experian forward Plaintiff Investigation Results, wherein Experian informed Plaintiff that Defendant verified the disputed Account as accurate and updated the Account information.  Accordingly, the Account remained on his credit report.

87.     On or about September 10, 2025, TransUnion forwarded Plaintiff its Investigation Results, wherein TransUnion informed Plaintiff that Defendant verified the Account as accurate.  As a result, the Account remained on his credit report.

88.     On September 12, 2025, Equifax sent Defendant an ACDV informing Defendant that Plaintiff disputed the Account as "True Identity Fraud," and "Account Fraudulently Opened."  On September 26, 2025, Defendant, by and through its employee BGreenAPI, responded to Equifax's ACDV by verifying the reporting of the Account as accurate.

89.     On October 13, 2025, Equifax sent Defendant an ACDV informing Defendant that "Consumer States Inaccurate Information," "Provide or Confirm Complete ID and Verify All Account Information." On October 29, 2025, Defendant, by and through its employee MLintAPI, responded to Equifax's ACDV by verifying the reporting of the Account as accurate.

90.     On or about October 22, 2025, Experian sent Defendant an ACDV informing

Defendant that Plaintiff disputed the Account as "True Identity Fraud," "Account Fraudulently Opened."  On November 5, 2025, Defendant, by and through its employee TBowenAPI, responded to Experian's ACDV by verifying the reporting of the Account as accurate.

91.     Plaintiff is working to purchase a home, but Defendant's ongoing refusal to remove the fraudulent Account from Plaintiff's credit report is preventing Plaintiff from being able to do so.

92.     To date, Defendant continues to intentionally and maliciously report the fraudulent Account as belonging to Plaintiff to the consumer reporting agencies, which in turn provide Plaintiff's credit reports to multiple third parties including Plaintiff's creditors, potential creditors, insurance companies and others.

93.     For the past two years, Defendant has continued to report false, libelous, inaccurate, and defamatory information regarding the Plaintiff to the national credit bureaus and to numerous third parties.  While Defendant has reported the fraudulent Account as belonging to Plaintiff on his credit reports, said information was provided to and/or viewed by Navy FCU, Mission Lane, Granite Bay Acceptance Company, Progressive Insurance, Debthunch, Advantage 1st Financial, LLC, Capital One, First National Credit Card, FSB Blaze Credit Card, TAB/Mission Lane, EC Hilton Head Regional Medical Center, TD Banknorth, CPC Credit Vision, Verizon Wireless, Jewelers Mutual Insurance, First National Credit Card, GMFinancial, First Sav BankBlaze, Ally Financial, Lenders Protection, LLC, Pagaya, and others.

94.     Defendant's knowing and repeated violations of the FCRA warrants an award of

18

punitive damages. *See, e.g., Younger v. Experian Info. Sols. Inc.,* Case No. 2:15-cv-00952-SGC, at *30 (N.D. Ala. Mar. 21, 2019) (awarding punitive damages for repeated, willful violations of the FCRA).

## <u>COUNT ONE</u>
### (Violation of the Fair Credit Reporting Act)

95.     Plaintiff hereby adopts all of the allegations set forth in paragraphs 12 through 94 as if set forth fully herein.

96.     The FCRA was created to protect consumers from the transmission of inaccurate information about them. *Guimond v. Trans Union Credit Information Co., 45 F.3d 1329, 1333 (9th Cir. 1995).*

97.     The law in this District, the Fourth Circuit, and even nationally has long ago been articulated to require a detailed and searching investigation by a furnisher when it receives a consumer's FCRA dispute through a consumer reporting agency.

98.     Defendant violated 15 U.S.C. §1681s-2(b) by failing to investigate the accuracy of the information reported by the Defendant to the consumer reporting agencies.

99.     On at least one occasion within the past two years, by example only and without limitation, Defendant violated 15 U.S.C. §1681s-2(b)(1)(A) by failing to fully and properly investigate after receiving notice that the Plaintiff disputed the information said Defendant had provided to a consumer reporting agency.

100.    On at least one occasion within the past two years, by example only and without limitation, Defendant violated 15 U.S.C. §1681s-2(b)(1)(B) by failing to review all relevant information provided by the consumer reporting agencies.

101.   As a result of Defendant's violations of 15 U.S.C. §1681s-2(b)(1)(A) and (B), Plaintiff suffered actual damages including, but not limited to, delay in seeking credit to purchase a home, lost opportunities to receive credit, damage to his reputation and credit reputation, worry, anxiety, physical sickness, physical pain, headaches, loss of sleep, distress, anger, family discord, loss of enjoyment of life, frustration, embarrassment, and humiliation.  Plaintiff has also suffered damages for certified mail expenses, and other out-of-pocket losses.  Plaintiff is entitled to actual damages in an amount to be determined by the jury.

102.   Defendant received over 20 ACDVs from the CRAs, many of which included Plaintiff's FTC Fraud Affidavit, a Police Report, and/or proof the Account had been paid in full.  In response to the ACDVs, Defendant completely failed and/or refused to conduct a detailed and searching inquiry as required by the FCRA.  Instead, Defendant simply verified the Account each and every time it received an ACDV regarding Plaintiff's dispute of the Account as not his and/or fraudulent.

103.   The violations by Defendant were willful, rendering Defendant liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.  In the alternative, Defendant was negligent, entitling the Plaintiff to recovery under 15 U.S.C. §1681o.

104.   Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Defendant in an amount to be determined by a jury pursuant to 15 U.S.C. §1681n and §1681o.

## COUNT TWO
### (Fair Credit Reporting Act)

105.   The Plaintiff adopts the averments and allegations of paragraphs 12 through 104 hereinbefore as if fully set forth herein.

106.   On one or more occasions within the past two years, by example only and without limitation, Defendant violated 15 U.S.C. §1681s-2(b)(1)(C) and (D) by publishing the Defendant's inaccuracies within Plaintiff's credit files with the credit reporting agencies and by failing to correctly report results of an accurate investigation to each credit reporting agency.

107.   Defendant violated 15 U.S.C. §1681s-2(b)(1)(C) by reporting inaccurate, incomplete, false, and misleading results of the investigation, if any, to at least one consumer reporting agency.

108.   Defendant violated 15 U.S.C. §1681s-2(b)(1)(D) by failing to notify all consumer reporting agencies that the reporting of the Account was inaccurate, incomplete, false, and misleading.

109.   Defendant failed to add a Compliance Condition Code when responding to ACDVs received from the credit reporting agencies.

110.   Defendant knew that Plaintiff disputed the subject account on at least one occasion directly with Defendant and its agents.

111.   The Plaintiff's disputes were, at a minimum, *bona fide*.

112.   As a result of Defendant's violations of 15 U.S.C. §1681s-2(b)(1)(C) and (D), the Plaintiff has suffered and will continue to suffer actual damages including, but not limited

to, delay in seeking credit to purchase a home, lost opportunities to receive credit, damage to reputation and credit reputation, worry, anxiety, physical sickness, physical pain, headaches, loss of sleep, distress, anger, family discord, loss of enjoyment of life, frustration, embarrassment, and humiliation.  Plaintiff has also suffered damages for certified mail expenses, and other out-of-pocket losses.  Plaintiff is entitled to actual damages in an amount to be determined by the jury.

113.   The violations by Defendant were willful, rendering Defendant liable for punitive damages in an amount to be determined by the jury pursuant to 15 U.S.C. §1681n.  In the alternative, Defendant was negligent, entitling the Plaintiff to recovery under 15 U.S.C. §1681o.

114.   The Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees, pursuant to 15 U.S.C. §1681n and §1681o.

## COUNT THREE
**(Defamation, Libel, and Slander)**

115.   The Plaintiff adopts the averments and allegations of paragraphs 12 through 114 hereinbefore as if fully set forth herein.

116.   Defendant willfully, wantonly, recklessly and/or maliciously published and communicated false and defamatory statements regarding Plaintiff to third parties and the public at large.  Said statements harmed Plaintiff's reputation and caused Plaintiff physical sickness, mental anguish, and emotional distress.

117.   Said communications were false in that Plaintiff was not indebted to Defendant. Plaintiff did not owe any balance on the Account the subject of this action as said Account

22

was clearly fraudulent and Plaintiff had paid off the Account in hopes to be able to secure a loan.

118.    Said false and defamatory statements have harmed the reputation of Plaintiff and/or deterred third persons from associating with Plaintiff.  While Defendant has reported the fraudulent Account as belonging to Plaintiff on his credit reports, said information was provided to and/or viewed by Navy FCU, Mission Lane, Capital One Auto Finance, Serpentini Chevrolet, Granite Bay Acceptance Company, Progressive Insurance, Debthunch, Advantage 1st Financial, LLC, Capital One, First National Credit Card, FSB Blaze Credit Card, TAB/Mission Lane, The Bank of Missouri, EC Hilton Head Regional Medical Center, TD Banknorth, CPC Credit Vision, Verizon Wireless, Jewelers Mutual Insurance, First National Credit Card, GMFinancial, First Sav BankBlaze, Ally Financial, Lenders Protection, LLC, Pagaya, and others.

119.    Defendant communicated to third parties and the public at large false information concerning Plaintiff, disseminating and imputing false and misleading credit worthiness information concerning Plaintiff, including but not limited to reporting that Plaintiff owed the Account the subject of this action.

120.    At the time said communications were made, Defendant knew or should have known the falsity of the communications or recklessly disregarded the potential inaccuracy of the information, yet knowingly, willfully, and maliciously communicated the falsity.

121.    As a result of Defendant's intentional communications to third parties of the false information, Plaintiff was caused to suffer injury to his reputation in the eyes of his community and the public at large, and was forced to endure credit reporting of the Account

in spite of the fact that Plaintiff did not owe the Account as it was fraudulently opened in his name without his knowledge or permission.

122.    As a proximate consequence of said defamation, libel and slander, the Plaintiff suffered damage to his credit and credit reputation, was denied credit, was forced to delay is applying for credit, and lost credit opportunities. Additionally, Plaintiff suffered humiliation, anxiety, stress, loss of sleep, anger, worry, physical sickness, headaches, mental anguish, family discord, lost time, and loss of enjoyment of life, for which he seeks compensatory and punitive damages.

## AMOUNT OF DAMAGES DEMANDED

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands a judgment against Defendant for the following:

A.    Actual and statutory damages from Defendant pursuant to 15 U.S.C. §1681n(a)(1)(A) and/or 15 U.S.C. §1681o(a)(1);

B.    Punitive damages from Defendant pursuant to 15 U.S.C. §1681n(a)(2);

C.    Costs and reasonable attorney's fees from Defendant pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2);

D.    For compensatory and punitive damages in an amount to be determined by a struck jury for Defendant's defamation, libel and slander;

E.    For this matter to be heard by a jury; and

F.    For such other and further relief as the Court may deem just and proper.

/s/ *Penny Hays Cauley*
Penny Hays Cauley, Fed. ID No. 10323

24

**HAYS CAULEY, P.C.**
1303 West Evans Street
Florence, SC 29501
(843) 665-1717
phc917@hayscauley.com
*Attorney for Plaintiff*


**PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY ON ALL COUNTS**


*/s/ Penny Hays Cauley*
Of Counsel


**DEFENDANT TO BE SERVED VIA CERTIFIED MAIL:**
Merrick Bank
c/o C T Corporation System – Registered Agent
2 Office Park Court, Suite 103
Columbia, South Carolina 29223